**No. 25-10871**

# In the
# United States Court of Appeals for the Fifth Circuit

**SECURITIES AND EXCHANGE COMMISSION,**

*Plaintiff-Appellee,*

**v.**

**TIMOTHY BARTON,**

*Defendant-Appellant*

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:22-cv-02118-X

## APPELLANT'S BRIEF

**Timothy L. Barton**
*Pro Se Appellant*
1846 E Rosemeade Pkwy,
#232 Carrollton, TX 75007
Tel: (214) 673-8714
Timothy.Barton@proton.me

# CERTIFICATE OF INTERESTED PERSONS

**NO. 25-10871**

SECURITIES AND EXCHANGE COMMISSION,
*Plaintiff-Appellee,*

v.

TIMOTHY BARTON,
*Defendant-Appellant*

Pursuant to Fifth Circuit Rule 28.2.1, the undersigned counsel certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1. 126 Villita LLC, receivership entity
2. 2999TC Acquisitions, LLC, receivership entity
3. 2999TC JMJ CMGR, LLC (Delaware), receivership entity
4. 3820 Illinois, LLC, interested party
5. Ackerman LLP, counsel for interested parties DLP Real Estate Capital, Inc., DLP Winter Haven Ventures, LLC, Orchard Farms Ventures, LLC, and Marine Creek Ventures, LLC
6. Adam and Reese LLP, counsel for interested party Bank of America, N.A.

7. Alexander, Daniel Rasoul, counsel for interested party Dhiraj Ramolia
8. AVG West, LLC, receivership entity
9. Badgley, Serena, interested party
10. Bank of America, N.A., interested party
11. Barbero, Megan, counsel for plaintiff-appellee Securities and Exchange Commission
12. Barton, Maximilien, interested party
13. Barton, Timothy, defendant-appellant
14. Baum, Nathan B., counsel for interested parties Maximilien Barton, MXBA LLC, and TRTX Properties LLC, and receivership entities Gillespie Villas LLC, TC Hall, LLC, Titan Investments LLC, a/k/a Titan 2022 Investments, LLC, and Venus59 LLC
15. BEE2019, LLC, receivership entity
16. Bernstein, Keefe M., counsel for plaintiff-appellee Securities and Exchange Commission
17. Bird, Douglas Steven, counsel for interested party City of Frisco, Texas
18. BM318 LLC, receivership entity
19. Broadview Holdings Trust, receivership entity

20. Brown Fox PLLC, counsel for receiver Cortney C. Thomas

21. Buchholz, Robert W., counsel for interested party Southern Star Capital LLC

22. Cain & Skarnulis PLLC, counsel for interested party Serena Badgley

23. Capps, Aaron T., counsel for interested party Circle H Contractors LP

24. Capps and Associates PLLC, counsel for interested party Circle H Contractors LP

25. Carnegie Development, LLC, defendant and receivership entity

26. Carrillo, C. Alan, counsel for receiver Cortney C. Thomas

27. Chandler & Shavin PLLC, counsel for interested party Dhiraj Ramolia

28. Chandler Law PC, counsel for interested party Dhiraj Ramolia

29. Chandler, Corinna P., counsel for interested party Dhiraj Ramolia

30. Chapple, Ryan E., counsel for interested party Serena Badgley

31. Cheves, P. Kyle, counsel for interested party McCormick 101, LLC

32. Circle H Contractors LP, interested party

33. Conley, Michael A., counsel for plaintiff-appellee Securities and Exchange Commission

34. Cooke, Chris, counsel for interested parties Maximilien Barton, MXBA LLC, and TRTX Properties LLC, and receivership entities Gillespie Villas LLC, TC Hall, L.L.C., Titan Investments LLC, a/k/a Titan 2022 Investments, LLC, and Venus59 LLC

35. Cox, Eric Angela Nealy, counsel for interested party HNGH Turtle Creek

36. Cox, Sarah M., counsel for interested parties Tamamoi, LLC and 3820 Illinois, LLC

37. Curran, Thomas J., counsel for interested parties Moss & Associates, LLC and MFO Venus Development, LLC

38. D4DS LLC, receivership entity

39. D4FR LLC, receivership entity

40. D4IN, LLC (Texas), receivership entity

41. D4KL LLC, receivership entity

42. D4MC, LLC (Texas), receivership entity

43. D4OP, LLC, receivership entity

44. Dentons US LLP, counsel for interested party McCormick 101, LLC

45. DeYoung, Kyle M., counsel for interested party HNGH Turtle Creek, LLC

46. DJD Land Partners, LLC, relief defendant and receivership entity

47. DLP Real Estate Capital, Inc. interested party

48. DLP Winter Haven Ventures, LLC, interested party

49. Edney, Michael J., counsel for defendant-appellant Timothy Barton

50. Enoch Investments LLC, receivership entity

51. Etri, James E., counsel for plaintiff-appellee Securities and Exchange Commission

52. FHC Acquisition LLC, receivership entity

53. Freda, Dominick V., counsel for plaintiff-appellee Securities and Exchange Commission

54. First Development Company of Ohio LLC, interested party

55. Fu, Haoqiang, defendant

56. Fullington, Ian E., counsel for interested parties Moss & Associates, LLC and MFO Venus Development, LLC

57. Gillespie Villas LLC, receivership entity

58. Gitlin, Jonathan Alexander, counsel for interested party First Development Company of Ohio LLC

59. Goldmark Hospitality LLC, receivership entity

60. Green, Gordon Welborne, counsel for interested party Truist Bank

61. Hale, Harlin D., counsel for ADR Provider

62. Hamilton, Spencer D., counsel for interested party McCormick 101, LLC

63. Heiskell, Michael P., counsel for defendant Stephen T. Wall

64. Hicks, Jr., George W., counsel for interested party HNGH Turtle Creek, LLC

65. Hill, Ezekiel L., counsel for plaintiff-appellee Securities and Exchange Commission

66. HNGH Turtle Creek, LLC, interested party

67. Holland & Knight LLP, counsel for defendant-appellant Timothy Barton

68. Hopper, Jr., James F., counsel for receiver Cortney C. Thomas

69. HR Sterling, LLC, receivership entity

70. Hunter, Renee M., counsel for intervenor United States of America

71. Hunton Andrews Kurth LLP, counsel for defendant-appellant Timothy Barton

72. Chinese Co-lenders

1. Hong Guo
2. Yijing Wu
3. Nanjing Sun
4. Kangying Mao
5. Huaizhen Gao
6. Wanwan Li
7. Yue Xu
8. Lan Ji
9. Wei Xing
10. Wenjun Wang
11. Jie Zou
12. Jun Wang
13. Lin Li
14. Yunding Kang
15. Shuping Yang
16. ChangHua Lin
17. Pei Guan
18. Yulan Chen

19. Hairuo Yang
20. Xuegeng Gong
21. Haiming Xu
22. Aiguo Luo
23. Yi Tang
24. Xuezhen Cai
25. Jingqiu Tang
26. Qu Chen
27. Yue Zhang
28. Sun Zhang
29. Xiangdong Zhu
30. Yaohua Lin
31. Jiancheng Chen
32. Min Deng
33. Liying Mao
34. Zhongguo Feng
35. Liying Yang
36. Dan Wu
37. Ying Ding
38. Hanjiang Fu
39. Yuan Yuan

40. Hanjiang Fu

41. Hua Cai

42. Ruiling Xiao

43. Chenchen Jiang

44. Pengfei Dong

45. Xiaodong Hao

46. Xiaoquan Dai

47. Jialin Hu

48. Heng Zhang

49. Fang Ding

50. Lin Gao

51. Fei Gao

52. Qin Chu

53. Gang Xu

54. Ling Guan

55. Chao Xu

56. Weipeng He

57. Jianjin Li

58. Zhenhua Li

59. Qiao Qin

60. Ying Zhang

61. Jiaxiang Lu

62. Weijia Kong

63. Li Jang

64. Li wen Bian

65. Jun Li

66. Youhong Zhu

67. Rongping Wu

68. Yadan Liu

69. Rufeng Ding

70. Lin Zhou

71. Jinghui Ma

72. Yun Sun

73. Guoqin Zhou

74. Qiuying Li

75. Bingjie Xu

76. Shufang Luo

77. Tianqing Song

78. Ping Chen

79. Di Tang

80. Jin Wang

81. Fuqing Chen

82. Kui Wang

83. Weisi Wang

84. Yi Qu

85. Xiaomin Fan

86. Cunxiang Ji

87. Jinzhe Wu

88. Ruinian Wu

89. Wen Wu

90. Ou Jiang

91. Feng Yan

92. Mai Ye

93. Wenjuan Yin

94. Kai Tian

95. Ling Zhong

96. Sicheng Zhan

97. Yan Zhang

98. Ying Zhou

99. Jun Zeng

100. Peng Guo

73. JMJ Acquisitions LLC, receivership entity

74. JMJ Development LLC, receivership entity

75. JMJ Hospitality, LLC, receivership entity

76. JMJ VC Management, LLC, receivership entity

77. JMJAV, LLC, receivership entity

78. JMJD4, LLC (Delaware), receivership entity

79. JMR100 LLC, receivership entity

80. Johnson Vaughn & Heiskell, counsel for defendant Stephen T. Wall

81. Johnston Clem Gifford PLLC, counsel for interested party Truist Bank

82. Kane Russell Coleman & Logan PC, counsel for interested party HNGH Turtle Creek, LLC

83. Kane, John J., counsel for interested party HNGH Turtle Creek, LLC

84. Kearns, David T., counsel for interested parties Maximilien Barton, MXBA LLC, and TRTX Properties LLC, and receivership entities Gillespie Villas LLC, TC Hall, L.L.C., Titan Investments LLC, a/k/a Titan 2022 Investments, LLC, and Venus59 LLC

85. Kirkland & Ellis LLP, counsel for interested party HNGH Turtle Creek, LLC

86. Kleinsasser, Matthias, counsel for interested party Vertical Street Ventures, LLC

87. Koonce, Charlene C., counsel for receiver Cortney C. Thomas

88. Lajolla Construction Management LLC, receivership entity

89. Law Office of Robert W. Buchholz PC, counsel for interested party Southern Star Capital LLC

90. LC Aledo TX, LLC, receivership entity

91. LDG001, LLC, relief defendant and receivership entity

92. Lesser, Joshua A., counsel for interested party Bank of America, N.A.

93. Light, Barbara, counsel for interested parties Maximilien Barton, MXBA LLC, and TRTX Properties LLC, and receivership entities Gillespie Villas LLC, TC Hall, L.L.C., Titan Investments LLC, a/k/a Titan 2022 Investments, LLC, and Venus59 LLC

94. Linebarger Goggan Blair & Sampson, LLP, counsel for interested party City of Frisco, Texas

95. Louisiana National Bank, interested party

96. Lynco Ventures, LLC, receivership entity

97. Mansion Apartment Homes at Marine Creek, LLC, receivership entity

98. Marine Creek SP, LLC, receivership entity

99. Marine Creek Ventures, LLC, interested party

100. McCormick 101, LLC, interested party

101. Mitchell, Jonathan F., counsel for defendant-appellant Timothy Barton

102. MFO Venus Development, LLC, interested party

103. MO 2999TC, LLC, receivership entity

104. Moeller, Evan A., counsel for interested party Bank of America, N.A.

105. Moss & Associates, LLC, counsel for interested party MFO Venus Development LLC

106. Munsch Hardt Kopf & Harr, P.C., counsel for interested party The Dixon Water Foundation

107. MXBA LLC, interested party

108. Napoli, Michael D., counsel for interested parties DLP Real Estate Capital, Inc., DLP Winter Haven Ventures, LLC, Orchard Farms Ventures, LLC, and Marine Creek Ventures, LLC

109. Nealy Cox, Erin, counsel for interested party HNGH Turtle Creek, LLC

110. Nicholson, Jill L., counsel for interested party McCormick 101, LLC

111. Norred, Soloman George, counsel for defendant-appellant Timothy Barton

112. Norred, William V., counsel for defendant-appellant Timothy Barton

113. Norred Law, PLLC, counsel for defendant-appellant Timothy Barton

114. Norman, Brian K., counsel for interested party Southern Properties Capital, Ltd.

115. Norris, Jeffrey Blair, counsel for interested party Southern Properties Capital, Ltd.

116. Northstar PM, LLC (Texas), receivership entity

117. Norton Rose Fulbright US LLP, counsel for interested parties Maximilien Barton, MXBA LLC, and TRTX Properties LLC, and receivership entities Gillespie Villas LLC, TC Hall, L.L.C., Titan Investments LLC, a/k/a Titan 2022 Investments, LLC, and Venus59 LLC

118. O'Connell, Sean B., counsel for defendant-appellant Timothy Barton

119. Orchard Farms Ventures, LLC, interested party

120. Orchard Farms Village LLC, receivership entity

121. Palisades-TC, LLC, interested party

122. Patton, Jonathan R., counsel for interested party Palisades-TC, LLC

123. Peckar & Abramson, counsel for interested parties Moss & Associates, LLC and MFO Venus Development, LLC

124. Perry, Deborah M., counsel for interested party The Dixon Water Foundation

125. Pioneer Finance, Inc., interested party

126. Polsinelli PC, counsel for interested party McCormick 101, LLC

127. Ramer, Samuel, counsel for interested parties Maximilien Barton, MXBA LLC, and TRTX Properties LLC, and receivership entities Gillespie Villas LLC, TC Hall, L.L.C., Titan Investments LLC, a/k/a Titan 2022 Investments, LLC, and Venus59 LLC

128. Ramolia, Dhiraj, interested party

129. Ridgeview Addition, LLC (Texas), receivership entity

130. Roossien, Jr., Dennis L., counsel for interested party The Dixon Water Foundation

131. Rose, Shirley B., counsel for interested party Texas Republic Bank, N.A.

132. Scheef & Stone, L.L.P., counsel for interested party Texas Republic Bank, N.A.

133. Schurr, Patrick J., counsel for interested party Texas Republic Bank, N.A.

134. Scott, John B., counsel for interested party Pioneer Finance, Inc.

135. Scott & Scott, PLLC, counsel for interested party Pioneer Finance, Inc.

136. Seagoville Farms, LLC, receivership entity

137. Securities and Exchange Commission, plaintiff-appellee

138. SF Rock Creek, LLC, receivership entity

139. Shamoun & Norman, LLP, counsel for interested party Southern Properties Capital, Ltd.

140. Shamoun, C. Gregory, counsel for interested party Southern Properties Capital, Ltd.

141. Shavin, Eliot Dana, counsel for interested party Dhiraj Ramolia

142. Slim, Jules P., counsel for defendant-appellant Timothy Barton

143. Sosland, Martin Allen, counsel for interested party Louisiana National Bank

144. Southern Properties Capital, Ltd., interested party

145. Southern Star Capital LLC, interested party

146. Spector & Cox, PLLC, counsel for interested parties Tamamoi, LLC and 3820 Illinois, LLC

147. Spector, Howard Marc, counsel for interested parties Tamamoi, LLC and 3820 Illinois, LLC

148. Taylor, Clay M., counsel for interested party McCormick 101, LLC

149. Tamamoi, LLC, interested party

150. TC Hall, LLC, receivership entity

151. Texas Republic Bank, N.A., interested party

152. The Dixon Water Foundation, interested party

153. Thomas, Cortney C., receiver

154. Tillotson Johnson & Patton, counsel for interested party Palisades-TC, LLC

155. Titan Investments LLC, a/k/a Titan 2022 Investments, LLC, receivership entity

156. TRTX Properties LLC, interested party

157. Truist Bank, interested party

158. United States of America, intervenor

159. Venus59 LLC, receivership entity

160. Vertical Street Ventures, LLC, interested party

161. Villita Development, LLC, receivership entity

162. Villita Towers LLC, receivership entity

163. Wall, Stephen T., defendant

164. Wall007, LLC, defendant and receivership entity

165. Wall009, LLC, defendant and receivership entity

166. Wall010, LLC, defendant and receivership entity

167. Wall011, LLC, defendant and receivership entity

168. Wall012, LLC, defendant and receivership entity

169. Wall016, LLC, defendant and receivership entity

170. Wall017, LLC, defendant and receivership entity

171. Wall018, LLC, defendant and receivership entity

172. Wall019, LLC, defendant and receivership entity

173. Waller, Greg, counsel for Hunton Andrews Kurth LLP, counsel to defendant-appellant Timothy Barton

174. Wells, Tim, counsel for receiver Cortney C. Thomas

175. Wielebinski, Joe, counsel for interested party Vertical Street Ventures, LLC

176. Winstead PC, counsel for interested party Vertical Street Ventures, LLC

177. WRL2019, LLC (Texas), receivership entity

The undersigned counsel certifies that the above list includes all persons, associations of persons, firms, partnerships, or corporations that have a financial interest in the outcome of this appeal as required by Fifth Circuit Rule 28.2.1.

*/s/Timothy L. Barton*
Timothy L. Barton,
Pro Se Appellant
Date: November 26, 2025

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34 and Fifth Circuit Rule 28.2.3, Appellant respectfully requests oral argument.

**First**, this case presents seven independent grounds for reversal, including threshold jurisdictional questions: whether the SEC has subject-matter jurisdiction when transactions are commercial loans rather than securities; whether the district court could seize property under exclusive bankruptcy jurisdiction per 28 U.S.C. § 1334(e); and whether a receivership may continue after administrative closure under *Mire v. Full Spectrum Lending*, 389 F.3d 163 (5th Cir. 2004).

**Second**, unprecedented structural conflicts infect these proceedings. The receiver's counsel includes two former law clerks to the presiding judge (Allan Carrillo and Tim Wells), and lead counsel Charlene Koonce shares Judge Starr's alma mater (Abilene Christian University). The court rejected the SEC's recommended receiver—a real estate expert—for one with zero real estate experience, then denied 100% of defense motions while granting 100% of receiver requests.

**Third**, the constitutional dimensions are extraordinary: over $400 million seized pre-trial for an alleged $26 million harm (a 15:1 ratio);

violations of *SEC v. Jarkesy*, 34 F.4th 446 (5th Cir. 2022), regarding jury trial rights; and the receiver acting as investigator, witness, and beneficiary of his own reappointment.

**Fourth**, the district court barred Appellant from filing bar grievances without prior court approval—an unconstitutional prior restraint on First Amendment petition rights—while simultaneously finding "no bad faith" by the receiver.

**Fifth**, the receiver's fire sales destroyed value rather than preserving it: BM318 worth $55 million settled for $175,000 (99.7% loss); 2999 Turtle Creek appraised at $72.5 million settled for $2.5 million (96.6% loss); DLP properties worth $32 million settled for $750,000 (97.6% loss). The receiver collected over $3 million in fees while distributing $0 to alleged victims—all during a DOJ stay period with no genuine urgency.

**Sixth**, the evidentiary foundation is fundamentally flawed: the SEC's "staff accountant" is not an accountant; no tracing methodology was disclosed; accounting ledgers showing intercompany loans were ignored; and the receiver admitted only "incomplete and limited tracing."

**Seventh**, Appellant reported Chinese money laundering to federal authorities in 2019; those authorities declined, calling it a "Chinese nationals problem"; after the 2021 administration change, the same agencies prosecuted Appellant while immunizing the alleged money launderer.

Given these jurisdictional, structural, constitutional, fiduciary, evidentiary, and public policy dimensions, oral argument would substantially aid the Court.

# TABLE OF CONTENTS

**CERTIFICATE OF INTERESTED PERSONS** **ii**

**STATEMENT REGARDING ORAL ARGUMENT** **xxii**

**TABLE OF CONTENTS** **xxv**

**TABLE OF AUTHORITIES** **xxix**

**JURISDICTIONAL STATEMENT** **1**

**STATEMENT OF ISSUES PRESENTED FOR REVIEW** **3**

**STATEMENT OF THE CASE** **8**

**SUMMARY OF THE ARGUMENT** **18**

**STANDARD OF REVIEW** **25**

**ARGUMENT** **27**

*I. THE DISTRICT COURT LACKED SUBJECT-MATTER JURISDICTION* *27*

A. The Transactions Were Commercial Loans, Not Securities 27

B. Violation of Exclusive Bankruptcy Jurisdiction 31

II. THE RECEIVERSHIP VIOLATES CONSTITUTIONAL PROTECTIONS 32

A. The 15:1 Seizure Ratio Is Unconstitutionally Disproportionate 32

B. Unlawful Seizure of Third-Party Assets 33

*III. STRUCTURAL CONFLICTS AND BIAS INFECTED THE PROCEEDINGS 35*

A. The Receiver's Counsel Includes Judge Starr's Former Law Clerks 35

B. The Court Rejected the SEC's Proposed Receiver 36

C. The Statistical Pattern: 100% Denial of Defense Motions 37

D. The Receiver Testified to His Own Reappointment 37

E. Netsphere Violation: Unlawful Pecuniary-Purpose Receivership 38

*IV. PROCEDURAL VIOLATIONS INDEPENDENTLY VOID THE RECEIVERSHIP 39*

A. Campbell-Kordel Violations 39

B. Reliance on Vacated Receiver's Evidence 41

C. Administrative Closure 46

D. Privilege Violations 47

*V. THE RECEIVERSHIP LACKS EVIDENTIARY FOUNDATION 53*

A. The District Court Failed to Rule on Evidentiary Objections 53

B. The SEC's Investigation vs. Receiver's Expansion 54

C. The "Staff Accountant" Is Not an Accountant 55

D. The SEC's Accountant Could Not Explain His Work 56

E. Accounting Records Were Ignored 57

F. The "Benefitted From" Standard Has No Legal Basis 57

G. Property-by-Property Tracing Failures 58

H. Entities Without Bank Accounts Were Included 67

I. The Receivership Has Caused More Harm Than the Alleged Fraud 68

*VI. THE RECEIVER BREACHED ALL FIDUCIARY DUTIES 70*

A. Scale of Destruction 70

B. Property-by-Property Destruction 71

C. Pattern of Artificial Emergencies 71

D. No Plan, No Victim Contact 72

*VII. FIRST AMENDMENT VIOLATION AND WHISTLEBLOWER RETALIATION 73*

A. Prior Restraint on Bar Grievances 73

B. Whistleblower Retaliation 74

**CONCLUSION 76**

**CERTIFICATE OF SERVICE 1**

**CERTIFICATE OF COMPLIANCE 1**

# TABLE OF AUTHORITIES

## Cases

*Alicea v. Commissioner*, 855 F. App'x at 496 ........................ 10

*Alicea v. Comm'r*, 855 F. App'x 494, 496 (11th Cir. 2021)... 41

*Bantam Books v. Sullivan* ........................................................ 7

*Batson v. Kentucky*, 476 U.S. 79, 93-94 (1986)...................... 37

*BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 524-25 (2002)... 73

Data Mktg. P'ship v. Dep't of Lab., 45 F. 4th 846, 859 (5th Cir. 2022) .................................................................... 10

*Educators Grp. Health Tr., 25 F.3d 1281, 1285 (5th Cir. 1994)* .......................................................................... 25

*Hartman v. Moore*, 547 U.S. 250, 259-60 (2006).................. 73

*Kirschner v. JP Morgan Chase Bank*, 79 F.4th 290, 308 (2d Cir. 2023) .................................................................... 29

*Liberte Capital Grp. v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006) .......................................................................... 69

*Long v. Shultz Cattle Co., 881 F.2d 129, 132 (5th Cir. 1989)* ............................................................................ 25

*Mire v. Full Spectrum Lending* .......................... xxii, 5, 21, 46

*Mire v. Full Spectrum Lending*, 389 F.3d 163 (5th Cir. 2004) .......................................................................... xxii

*Murchison*, 349 U.S. 133, 136 (1955) ............................ 37, 54

*Napue v. Illinois*, 360 U.S. 264, 269 (1959) ......................... 52

*Netsphere* .............................................................passim

*Netsphere v. Baron*, 703 F.3d 296, 304 (5th Cir. 2012) .... 1, 57

*Roman Catholic Archdiocese of San Juan v. Acevedo Feliciano*, 140 S. Ct. 696, 701 (2020) ................................ 44

*Roman Catholic Archdiocese v. Acevedo Feliciano*, 140 S. Ct. 696, 701 (2020) ....................................................... 41, 44

*Roman Catholic Archdiocese v. Acevedo Feliciano*, 140 S. Ct. at 701 ........................................................................ 21

*Scales v. United States*, 367 U.S. 203, 224-25 (1961) .......... 34

*SEC v. Barton*, No. 22-11132 (5th Cir. Mar. 26, 2024) .... 9, 62

*SEC v. Basic Energy*, 273 F.3d 657, 661 (6th Cir. 2001) ..... 31

*SEC v. Byers*, 609 F.3d at 92 ............................................ 13

*SEC v. Hardy*, 803 F.2d 1034, 1038 (9th Cir. 1986) ........... 69

*SEC v. Jarkesy* ..........................................................passim

*SEC v. Jarkesy*, 34 F.4th 446 (5th Cir. 2022)........xxiii, 33, 79

*SEC v. Safety Fin. Serv., Inc., 674 F.2d 368, 372 (5th Cir. 1982)* ................................................................................ 26

*Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 94 (1998) ............................................................................................ 27

*Steel Co.*, 523 U.S. at 94 ...................................................... 31

*United Housing Found. v. Forman*, 421 U.S. 837, 838 (1975) ............................................................................................ 30

*United States v. Bajakajian, 524 U.S. 321, 336 n.10 (1998)* ...................................................................................... 25, 33

*United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53-54 (1993) ........................................................................ 33

*United States v. Kordel*, 397 U.S. 1, 11 (1970) .................... 39

*United States v. Kuhrt, 788 F.3d 403, 420 (5th Cir. 2015)*.. 26

*United States v. M.C.C. of Florida, Inc.*, 967 F.2d at 1561.. 10

*United States v. Monsanto*, 491 U.S. 600, 612 n.11 (1989).. 37

United States v. Munsingwear, Inc., 340 U.S. 36 (1950) .... 10

*United States v. Munsingwear, Inc., 340 U.S. 36, 39-40 (1950)* ........................................................................ 25

*United States v. Polasek*, 162 F.3d 878, 883–84 (5th Cir. 1998) ........................................................................ 53

*United States v. Stringer*, 535 F.3d 929, 939 (9th Cir. 2008) ........................................................................ 40

*United States v. Tao*, 2022 WL 252019, at *12 (D. Kan. 2022) ........................................................................ 55

*Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).. 35

*WALL007, LLC, Case No. 22-41049 (Bankr. E.D. Tex., Sherman Division)* ........................................................ 8

*Ward v. Monroeville, 409 U.S. 57, 62 (1972)*........................ 25

*Willoughby v. United States ex rel. Dep't of the Army, 730 F.3d 476, 479 (5th Cir. 2013)*............................................ 25

**Statutes**

11 U.S.C. § 1141(a) ............................................................ 31

28 U.S.C. § 1334(e) ....................................................passim

## Rules

Federal Rule of Appellate Procedure 34............................ xxii

Federal Rule of Appellate Procedure 4(a)(1)(B) .................... 2

Federal Rule of Evidence 103............................................. 53

Fifth Circuit Rule 28.2.3.................................................. xxii

Rule 702.........................................................................passim

## Constitutional Provisions

Eighth Amendment .......................................................... 33

Fifth Amendment .........................................................passim

First Amendment.........................................xxiii, 7, 23, 77

Sixth Amendment............................................................. 51

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1291 over this appeal from a final decision. A receivership order is immediately appealable as a final decision when it authorizes liquidation and determines property rights. *Netsphere v. Baron*, 703 F.3d 296, 304 (5th Cir. 2012). The Third Receivership Order authorized immediate liquidation, distribution of proceeds, and payment of receiver fees—irreversibly determining parties' rights. ROA.18979-19006. Alternatively, this Court has jurisdiction under 28 U.S.C. § 1292(a)(1) over interlocutory orders granting, continuing, or modifying injunctions.

The district court exercised subject-matter jurisdiction under 28 U.S.C. § 1331, based on the SEC's claims under the Securities Act of 1933 and the Securities Exchange Act of 1934. Appellant challenges subject-matter jurisdiction on three grounds: (1) the transactions were commercial loans, not securities; (2) the court lacked authority over property under exclusive bankruptcy jurisdiction, 28 U.S.C. § 1334(e); and (3) the court lacked authority to continue receivership proceedings after administrative closure.

The district court entered the Third Receivership Order on June 23, 2025. ROA.18979-19006. Appellant filed his Notice of Appeal on July

22, 2025. ROA.19224-25. Because the SEC is a federal agency, the 60-day deadline of Federal Rule of Appellate Procedure 4(a)(1)(B) applies. This appeal, filed 29 days after entry, is timely.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

**I. Subject-matter jurisdiction.** Whether the district court lacked subject-matter jurisdiction where: (a) the transactions were private, fixed-return commercial real estate loans with demand provisions, real property collateral, and no profit-sharing—failing both the *Howey* and *Reves* tests for securities and falling within *Marine Bank v. Weaver*'s exclusion for privately negotiated debt; and (b) the court seized assets belonging to nine Wall LLC entities in active Chapter 11 proceedings, BM318 operating under a confirmed bankruptcy plan, and 2999TC under bankruptcy protection—all subject to exclusive bankruptcy jurisdiction under 28 U.S.C. § 1334(e).

**II. Constitutional violations.** Whether seizing over $400 million in assets pre-trial for an alleged $26 million harm—a 15:1 ratio—violates: (a) *Grupo Mexicano de Desarrollo v. Alliance Bond Fund*, which prohibits preliminary seizure to satisfy claims not yet established; (b) the Seventh Amendment jury trial right recognized in *SEC v. Jarkesy*; (c) Fifth Amendment due process, particularly where the court characterized the receivership as "punishment" before any finding of liability; and (d) constitutional protections for third parties, where the receiver seized assets of Appellant's son without evidence or

due process, sued his daughter (a former Trump administration employee), and targeted his ex-spouse before withdrawing for lack of evidence, sued all lawyers, consultants, employees and advisors of the Appellant and immediately stayed the case so that no one can come to support the Appellant. This is a shear punishment action and not a receivership action which has deprived the Appellant of all possible support.

**III. Structural due process, conflicts of interest and demonstrated bias.** Whether the receivership proceedings violated structural due process under *Tumey v. Ohio* and *Gibson v. Berryhill* where: (a) the receiver's counsel includes two former law clerks to the presiding judge; (b) lead counsel and the judge share the same alma mater; (c) the court rejected the SEC's recommended real estate expert in favor of a receiver with zero real estate experience; (d) the court denied 100% of defense motions while granting 100% of receiver requests; (e) the receiver testified as witness to his own reappointment; and (f) the receivership constitutes an unlawful pecuniary-purpose proceeding under *Netsphere v. Baron*—authorizing liquidation without any plan, pooling proceeds, establishing claims

administration, and paying $3+ million in receiver fees while distributing $0 to alleged victims.

**IV. Procedural violations: DOJ stay, vacatur, and administrative closure.** Whether the district court committed reversible procedural error by: (a) directing the receiver to gather evidence, conduct tracing, and compile "any and all information" after DOJ formally requested a stay following Appellant's criminal indictment, in violation of *Campbell v. Eastland* and *United States v. Kordel*; (b) relying on evidence created by a receiver whose authority this Court had vacated—rendering such actions "a legal nullity" with the "slate wiped clean" under *Netsphere*; and (c) permitting continued receivership operations after administratively closing the case on August 7, 2025, when *Mire v. Full Spectrum Lending* holds that administrative closure terminates active proceedings.

**V. Evidentiary failures and receiver overreach.** Whether the receivership lacks evidentiary foundation where: (a) the SEC's two-year investigation identified only 11 entities, yet the receiver expanded to 54 entities based on "corporate formation binders" and "common addresses"—not fraudulent transfers; (b) the SEC admitted conducting only "spot tracing"; (c) the SEC's "staff accountant" Carol

Hahn is not an accountant, disclosed no methodology, and was never qualified as an expert under Rule 702; (d) the receiver's accountant could not explain his own diagrams or account for $2.9 million in intervening deposits; (e) accounting ledgers documenting intercompany loans were ignored; (f) JMJ Development's $17 million in unaffected revenue was never disaggregated; (g) the "benefitted from" standard originated in SEC briefing, not any judicial decision; and (h) Appellant was denied access to his own documents while the receiver created the evidentiary record, violating due process and *Brady v. Maryland*.

**VI. Fiduciary breach and value destruction.** Whether the receiver breached fiduciary duties through fire-sale liquidations that destroyed value exceeding the alleged fraud, including: (a) BM318, worth $55 million under a confirmed bankruptcy plan, settled for $175,000 (99.7% loss); (b) 2999 Turtle Creek, appraised at $72.5 million with millions in third-party investment, settled for $2.5 million (96.6% loss); (c) DLP properties, with one parcel alone worth $32 million, settled for $750,000 total (97.6% loss); (d) Venus properties that could double or triple in value with proper development, where the receiver admitted "little grasp" of details; all while (e) the receiver collected $3+

million in fees, reserved $0 for alleged victims, never submitted a liquidation plan, and never contacted a single lender.

**VII. First amendment violation and whistleblower retaliation.**

Whether the district court violated the First Amendment by requiring judicial pre-approval before Appellant may file bar grievances—an unconstitutional prior restraint on petition rights under *Near v. Minnesota* and *Bantam Books v. Sullivan*—particularly where the court found "no bad faith" by the receiver; and whether this prosecution constitutes whistleblower retaliation under 18 U.S.C. § 1513 where: (a) Appellant discovered and reported Chinese money laundering to federal authorities in 2019; (b) authorities declined, calling it a "Chinese nationals problem"; (c) after the 2021 administration change, the same agencies prosecuted Appellant while immunizing the alleged money launderer Michael Fu; and (d) every alleged victim is a Chinese national, with not one appearing at any proceeding.

## STATEMENT OF THE CASE

### A. Nature of the Case and Procedural History

This appeal arises from an unprecedented receivership that has seized over $400 million in assets—including bankruptcy estate property, family trusts, and operating businesses—before any trial, without a jury, based on alleged harm of $26 million involving only Chinese nationals engaged in capital flight as purported victims.

**September 23, 2022:** The SEC filed a civil enforcement complaint against Appellant and others, alleging securities fraud involving approximately $26 million. ROA.78-106. Critically, at the time of filing:

- Nine Wall LLC entities (WALL007 through WALL019) were already in active Chapter 11 bankruptcy proceedings with reorganization plans in place in the Eastern District of Texas[1]
- BM318 was operating under a confirmed Chapter 11 plan with defined creditor rights approved by the bankruptcy court
- 2999 Turtle Creek was under bankruptcy protection with established creditor priorities

[1] *In re WALL007, LLC, Case No. 22-41049 (Bankr. E.D. Tex., Sherman Division)*

October-December 2022: Without the SEC requesting it, the receiver expanded the receivership from 11 entities identified in the complaint to over 160 entities. ROA.658-82, 757-63, 1242-51, 1415-44, 2657-67. The receiver justified this expansion by citing "corporate formation binders" and "common addresses" found at Appellant's office—not evidence of fraudulent transfers or involvement in any alleged scheme.

**November 2022:** The Department of Justice indicted Appellant and formally requested that the SEC civil action be stayed. ROA.1252-53. The district court issued a stay order but continued directing the receiver to gather evidence[2].

**March 26, 2024:** This Court vacated the First Receivership Order for lack of evidentiary support, rendering it "a legal nullity" with the "slate wiped clean." *SEC v. Barton*, No. 22-11132 (5th Cir. Mar. 26, 2024). Under *Netsphere*, the receiver's authority "immediately terminated" after a 90 days period of limited capacity culmination. The Fifth Circuit could have remanded for further consideration but chose vacatur—the remedy that "evaporates" the order "as if it never

[2] *SEC v. Barton, No. 3:22-cv-02118-X (N.D. Tex. Nov. 11, 2023) (electronic order), ECF No. 671.*

existed." *Alicea v. Commissioner*, 855 F. App'x at 496; Data Mktg. P'ship v. Dep't of Lab., 45 F. 4th 846, 859 (5th Cir. 2022).

**March 27, 2023** – November 2023: Despite vacatur rendering the order "void" with "no legal effect whatever," the district court directed the now-unauthorized receiver to prepare "interim reports," conduct tracing, and compile "any and all information" for reinstatement[3]. This violated the principle that vacated orders are "entitled to no legal effect. United States v. Munsingwear, Inc., 340 U.S. 36 (1950); *United States v. M.C.C. of Florida, Inc.*, 967 F.2d at 1561. Following this unlawful series of actions, a second receivership order was entered with even larger powers than before ROA.14810-37 and augmented by injunction order ROA.14838-50 and ratification and blessing order ROA.14851-59 all issued on the same date November 29, 2023.

**June 23, 2025:** The district court entered: (1) the Third Receivership Order over 54 entities, ROA.18981-84; and (2) an order prohibiting Appellant from filing bar grievances without prior approval, despite finding "no bad faith on the part of the Receiver." ROA.18977.

---

[3] *SEC v. Barton, No. 3:22-cv-02118-X (N.D. Tex. Aug. 31, 2023) (electronic order), ECF No.* 305

July 22, 2025: Appellant timely appealed. ROA.19224-25.

August 7, 2025: The district court administratively closed the case[4]. No reopening order has been entered. The receiver continues operating without judicial supervision.

## B. Relevant Facts

1. The Loans Were Commercial Transactions for Chinese Capital Flight, Not Securities

The transactions were private real estate loans with characteristics of commercial debt:

- Fixed interest rates (10-14% annually) regardless of project success
- Specified maturity dates with demand repayment provisions of 2 years
- Real property collateral securing each loan
- No profit-sharing or equity participation

[4] *SEC v. Barton, No. 3:22-cv-02118-X (N.D. Tex. Nov. 11, 2023) (electronic order), ECF No. 671*

- Individual negotiation under a master loan agreement with Platinum Investment Corporation (PIC) and complete solicitation by the employees of PIC and Michael Fu
- No public offering or secondary market trading
- Loan terminology throughout—never "investment" or "investor" language

ROA.14469-14557 (loan agreements); ROA.14433-36 (court findings).

Critically, the undisputed evidence shows these loans served as vehicles for Chinese capital flight ROA.14427:

- Fu demanded repayments to U.S. accounts, not return to China
- 65% of funds came from parties other than named lenders
- Fu's advisor Hi Boa Jang had CCP connections
- Appellant contemporaneously reported money laundering to Treasury and DOJ
- Not a single Chinese lender appeared at hearings or bankruptcy proceedings

**2. Bankruptcy Courts Had Exclusive Jurisdiction**

Before the SEC filed suit, the Wall LLC entities were in active bankruptcy proceedings with reorganization plans in place[5]. The entities had:

- Active reorganization plans under negotiation
- Debtor-in-possession status with court-approved counsel
- U.S. Trustee supervision

BM318 operated under a confirmed Chapter 11 plan specifying creditor distributions. ROA.16876. *The 2999TC* property was under bankruptcy protection with established creditor rights. *ROA 1298-99.*

Under 28 U.S.C. § 1334(e), bankruptcy courts had exclusive jurisdiction over these assets. The word "exclusive" means what it says. *SEC v. Byers*, 609 F.3d at 92.

**3. The SEC's Tracing Analysis Was Fundamentally Flawed**

The SEC's entire tracing effort rested on Carol Hahn and Mr. Cecil ROA 14428, ROA.19683. which are:

- Is not an accountant despite her title as "staff accountant"

[5] *In re WALL007, LLC, Case No. 22-41049 (Bankr. E.D. Tex., Sherman Division)*

- Is not a CPA and has no forensic accounting credentials
- Refused to disclose methodology used for tracing
- Would not identify documents relied upon
- Was not qualified as an expert under Rule 702

The SEC admitted conducting only "spot tracing" during its two-year investigation. ROA.19632. The receiver then appeared as witness at his own reinstatement hearing, admitting his tracing was "incomplete and limited." *ROA.19733.*

The accounting ledgers showing intercompany loans properly documented were completely ignored. ROA.11586.

**4. The Receiver Has Enriched Himself While Destroying Value**

To date, the receiver has:

- Collected in fees: $2,852,381.64 (with assumed approximately $3+ million pending)
- Distributed to victims: $0.00
- Reserved for lenders: $0.00

ROA.19340.

Meanwhile, the receiver has destroyed hundreds of millions in value through fire sales ROA.17481-91, ROA.7490-92, ROA.19369-407:

- **BM318**: Worth $55 million under confirmed bankruptcy plan, settled for $175,000 (99.7% loss)
- **2999TC**: Appraised at $72.5 million with millions in third-party investment, settled for $2.5 million (96.6% loss)
- **DLP Properties**: One property alone worth $32 million, portfolio settled for $750,000 (97.6% loss)
- **Illinois Property**: Worth over $1 million with closing imminent, settled for $75,000 (92.5% loss)
- **Venus Properties**: Could double/triple in value with proper development approvals—receiver had "little grasp" on details

The Stanford receiver, by contrast, was required to wait until conclusion for most fees. ROA.14385.

**5. Structural Conflicts of Interest**

The receiver is represented by Brown Fox PLLC, which employs at least two of Judge Starr's former law clerks:

- Allan Carrillo (former Starr clerk)

- Tim Wells (former Starr clerk)

The lead counsel, Charlene Koonce, shares Judge Starr's alma mater, Abilene Christian University. The SEC recommended David Wallace as receiver—an experienced real estate developer with specific expertise. ROA.19461Judge Starr rejected him in favor of Cortney Thomas, a lawyer with zero real estate experience. ROA.658-682. The SEC made no recommendation for Thomas's retention in its briefs and left the receiver identity blank in its proposed order. ROA.14417.

The court has:

- Denied 100% of defense motions
- Granted 100% of receiver requests
- Used punitive language describing need to "punish" Appellant before trial

ROA.658-682, ROA.14811-37, and ROA.18979-19006.

**6. JMJ Development Had Substantial Unaffected Revenue**

The undisputed evidence shows JMJ Development received at least $17 million in revenue over the relevant period having nothing to do with loan proceeds. ROA.11604-92; ROA.14431.

The accounting system shows more than $35 million of receipts into the Wall entities, when the SEC claims only $26.3 million in Chinese loans. ROA.14431.

Neither Ms. Hahn nor Mr. Cecil made any effort to disaggregate these funds or apply any accepted accounting methodology. Tr. at 114:24-25.

**7. Whistleblower Retaliation**

In 2019, Appellant discovered Michael Fu was laundering money:

- 65% of funds came from parties other than named lenders
- Fu demanded all repayments go to U.S. accounts, not China
- Fu's advisor Hi Boa Jang had CCP connections

Appellant hired Guidepost Solutions to investigate and report to federal authorities. ROA.14515. The FBI and Homeland Security declined, calling it a "Chinese nationals' problem". ROA.14515

After the January 2021 administration change, the same agencies that refused to investigate Fu began prosecuting Appellant. Fu received immunity. The government falsely stated that Appellant was a pilot planning to flee (the plane was in maintenance and Appellant has never been a pilot). *ROA*.19289.

Every alleged victim is Chinese. There are zero American victims.

## SUMMARY OF THE ARGUMENT

The Third Receivership Order suffers from seven categories of fatal defects, each independently requiring vacatur.

**I. Subject-Matter Jurisdiction.** The SEC lacks jurisdiction because the transactions were commercial real estate loans designed for Chinese capital flight—not securities. The loans carried fixed interest rates (10-14%), demand repayment provisions, real property collateral, and no profit-sharing or equity participation. They fail both the *Howey* test (no investment contract where purpose was capital flight, not investment; no common enterprise; fixed returns regardless of business success) and the *Reves* test (commercial motivation; no public distribution; loan terminology throughout; extensive alternative regulation). *Marine Bank v. Weaver* confirms that privately negotiated, collateralized debt is not a security. The SEC presented no testimony from any lender, performed no *Howey* or *Reves* analysis, and simply declared these loans "securities" by fiat. Not a single Chinese lender appeared at any proceeding. Compounding this jurisdictional defect, the district court violated 28 U.S.C. § 1334(e) by seizing property under exclusive bankruptcy court jurisdiction—including nine Wall LLC entities in active Chapter 11 proceedings,

BM318 operating under a confirmed plan, and 2999TC under bankruptcy protection. "Exclusive" means exclusive. Orders entered without jurisdiction are void *ab initio*.

**II. Constitutional Violations.** The receivership violates multiple constitutional provisions. The 15:1 seizure ratio—$400 million seized for alleged $26 million harm—exceeds anything *Grupo Mexicano* permits and inflicts punishment before any finding of liability. The district court's own language confirms the punitive purpose. *SEC v. Jarkesy* requires a jury trial when the SEC seeks penalties for fraud; that requirement applies with greater force when the government seizes everything pre-trial. The receiver further violated constitutional protections by seizing Appellant's son's assets without due process or evidence, suing his daughter (a former Trump administration employee) without basis, and targeting his ex-spouse before withdrawing for lack of evidence. The thesis appears to be that everything Appellant touches is tainted—yet the district court found the SEC "cannot yet confirm" these entities received or benefitted from any alleged fraud.

**III. Structural Due Process.** Disqualifying conflicts and demonstrated bias infect these proceedings. The receiver's counsel,

Brown Fox PLLC, employs two of Judge Starr's former law clerks (Allan Carrillo and Tim Wells). Lead counsel Charlene Koonce shares Judge Starr's alma mater, Abilene Christian University. The court rejected the SEC's recommended receiver—an experienced real estate developer—in favor of Cortney Thomas, who has zero real estate experience. The statistical pattern is damning: 100% of defense motions denied, 100% of receiver requests granted. The receiver testified as witness to his own reappointment, admitting his tracing was "incomplete and limited." Under *Tumey v. Ohio* and *Gibson v. Berryhill*, structural bias requires automatic reversal. The receivership further violates *Netsphere v. Baron*'s prohibition on pecuniary-purpose receiverships: it authorizes liquidation without any plan, pools proceeds, establishes claims administration, and pays $3+ million in receiver fees while distributing $0 to alleged victims and reserving $0 for lenders.

**IV. Procedural Violations.** Three procedural defects independently void the receivership. First, after DOJ requested a stay following Appellant's criminal indictment, the district court directed the receiver to gather evidence, conduct tracing, and compile "any and all information"—violating *Campbell v. Eastland* and *United States v.*

*Kordel*. Nearly all evidence supporting the Third Receivership Order was created during this prohibited period. Second, when this Court vacated the First Receivership Order, it rendered the order "a legal nullity" with the "slate wiped clean." The Fifth Circuit chose vacatur—not remand—intentionally "evaporating" the order as if it never existed. Yet the district court relied on evidence the vacated receiver created without authority. Attempts at nunc pro tunc ratification are "Orwellian revisionist history." *Roman Catholic Archdiocese v. Acevedo Feliciano*, 140 S. Ct. at 701. Third, the district court administratively closed the case on August 7, 2025, yet the receiver continues operating without judicial supervision. Under *Mire v. Full Spectrum Lending*, administrative closure terminates active proceedings.

**V. Evidentiary Failures.** The receivership lacks any competent evidentiary foundation. The SEC's two-year investigation identified 11 entities; the receiver expanded to 54 based on "corporate formation binders" and "common addresses"—not evidence of fraud. The SEC admitted conducting only "spot tracing." The SEC's "staff accountant" Carol Hahn is not an accountant, disclosed no methodology, and was never qualified under Rule 702. The district court found: "The

Commission and the Receiver failed to identify any methodology underlying their tracing analyses." The receiver's accountant could not explain his own diagrams or account for $2.9 million in intervening deposits. Accounting ledgers documenting intercompany loans were ignored. JMJ Development's $17 million in unaffected revenue was never disaggregated. The "benefitted from" standard has no legal basis—it "originated from the Commission's own briefing," not any judicial decision. Meanwhile, Appellant was denied access to his own documents while the receiver created the entire evidentiary record, violating due process and *Brady v. Maryland*.

**VI. Fiduciary Breach.** The receiver has destroyed value far exceeding the alleged fraud while enriching himself. BM318, worth $55 million under a confirmed bankruptcy plan, settled for $175,000—a 99.7% loss. 2999 Turtle Creek, appraised at $72.5 million with millions in third-party investment, settled for $2.5 million—a 96.6% loss. DLP properties, with one parcel alone worth $32 million, settled for $750,000 total—a 97.6% loss. Venus properties that could double or triple in value with proper development were mismanaged by a receiver who admitted "little grasp" of details. Total value destroyed exceeds $300 million. The receiver collected $3+ million in fees,

distributed $0 to victims, reserved $0 for lenders, never submitted a liquidation plan, and never contacted a single alleged victim. The Stanford receiver was required to wait for most fees; Thomas paid himself immediately. The receivership has caused more harm than the alleged fraud.

**VII. First Amendment and Retaliation.** The district court's order requiring judicial pre-approval before Appellant may file bar grievances is an unconstitutional prior restraint on First Amendment petition rights—particularly egregious where the court simultaneously found "no bad faith" by the receiver. The order further requires the estate to fund the receiver's defense, penalizing Appellant for exercising constitutional rights. Finally, this prosecution represents whistleblower retaliation. In 2019, Appellant discovered Michael Fu was laundering money: 65% of funds came from parties other than named lenders; Fu demanded repayments to U.S. accounts, not China; Fu's advisor had CCP connections. Appellant hired Guidepost Solutions to report to the FBI and Homeland Security. The agencies declined, calling it a "Chinese nationals’ problem." After January 2021, those same agencies prosecuted Appellant while granting Fu immunity. Every alleged victim is a Chinese national. Not

one appeared at any proceeding. The U.S. government is acting as a collection agency for foreign nationals against an American citizen who tried to report their crimes.

Each defect independently requires vacatur. Combined, they reveal a proceeding so fundamentally flawed that no remedy short of termination can cure it.

## STANDARD OF REVIEW

Jurisdictional The issues presented are predominantly legal questions subject to de novo review.

This Court reviews de novo: subject-matter jurisdiction, *Willoughby v. United States ex rel. Dep't of the Army, 730 F.3d 476, 479 (5th Cir. 2013);* whether a financial instrument constitutes a security under *Howey* and *Reves, Long v. Shultz Cattle Co., 881 F.2d 129, 132 (5th Cir. 1989);* exclusive bankruptcy jurisdiction under *28 U.S.C. § 1334(e), In re Educators Grp. Health Tr., 25 F.3d 1281, 1285 (5th Cir. 1994);* constitutional claims including due process and proportionality, *United States v. Bajakajian, 524 U.S. 321, 336 n.10 (1998);* the legal effect of vacatur, *United States v. Munsingwear, Inc., 340 U.S. 36, 39-40 (1950);* whether a receivership is an unlawful pecuniary-purpose proceeding, *Netsphere, Inc. v. Baron, 703 F.3d 296, 305 (5th Cir. 2012);* and whether an order constitutes an unconstitutional prior restraint.

Structural due process violations—including judicial bias and disqualifying financial conflicts—require automatic reversal without harmless-error analysis. *Tumey v. Ohio, 273 U.S. 510, 535 (1927); Ward v. Monroeville, 409 U.S. 57, 62 (1972).*

The admission of expert testimony under *Rule 702* and the general conduct of a receivership are reviewed for abuse of discretion. *United States v. Kuhrt, 788 F.3d 403, 420 (5th Cir. 2015); SEC v. Safety Fin. Serv., Inc., 674 F.2d 368, 372 (5th Cir. 1982).* However, whether expert testimony is required for complex financial tracing, and whether specific receiver actions exceeded equitable authority, present legal questions reviewed de novo*; Netsphere, 703 F.3d at 305.*

# ARGUMENT

## I. THE DISTRICT COURT LACKED SUBJECT-MATTER JURISDICTION

Subject-matter jurisdiction cannot be assumed, waived, or conferred by consent. *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 94 (1998). The district court lacked jurisdiction on two independent grounds: the transactions are not securities, and the court violated exclusive bankruptcy jurisdiction.

### A. The Transactions Were Commercial Loans, Not Securities

The district court's own findings defeat securities classification. The court found these were loans with fixed returns, collateral, demand provisions, and no equity participation—documented as "loans" throughout, never as "investments." ROA.14426, ROA.14433-36. More fundamentally, the evidence shows these transactions served Chinese capital flight, not investment:

"The evidence in the record suggests some intent to use the loans as opportunities for Chinese foreign nationals to patriate money in the United States and then move it to other U.S. accounts, which is contrary to an investment purpose." ROA.14434.

Supporting evidence: Fu demanded repayments to U.S. accounts, not China; 65% of funds came from parties other than named lenders; Fu's advisor had CCP connections; Appellant reported the scheme to DHS; and not one Chinese lender has appeared in any proceeding of bankruptcy courts. ROA.19305.

**1. The Reves Test**

Under *Reves v. Ernst & Young*, 494 U.S. 56 (1990), all four factors favor non-security treatment:

a) ***Factor One (Motivations)*****:** The borrower sought bridge financing for pre-development expenses—"not an example of a borrower seeking a loan for 'investment purposes.'" ROA.14434. The lenders sought capital flight, not investment returns. The SEC "had an opportunity to prove the lender's purpose, but chose not to bring any evidence from a Chinese national lender." ROA.14434.

b) ***Factor Two (Distribution)*****:** "The loans were not offered or sold to a broad segment of the public or designed to be traded on a secondary market." ROA.14435.

c) ***Factor Three (Expectations)*****:** "There is no language in the co-lender agreements about 'investments' or 'equity interests,'

'shares,' or 'ownership.'" ROA.14434-35. *See Kirschner v. JP Morgan Chase Bank*, 79 F.4th 290, 308 (2d Cir. 2023) (loan documentation defeats securities characterization).

d) ***Factor Four (Alternative Regulation)***: *Reves* asks whether "some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." 494 U.S. at 67.

Real estate lending is extensively regulated by state mortgage laws, federal banking regulations, RESPA, TILA, and the UCC. These regulatory schemes protect lenders and borrowers in commercial lending transactions. The securities laws need not—and were not designed to—duplicate this protection.

**2. The Howey Test**

These transactions fail every element of *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946):

a) **No investment**: The first *Howey* element requires an "investment of money." The Supreme Court has interpreted this to mean money paid with an expectation of receiving profits. Capital flight is not investment. ROA.14435.

b) **No common enterprise**: "Each loan agreement was associated with a single real estate project" with independent fixed returns. ROA.14435-36.

c) **No profit expectation**: Fixed interest is not "profits" under *United Housing Found. v. Forman*, 421 U.S. 837, 838 (1975). ROA.14436.

d) **No reliance on others' efforts**: Lenders had demand provisions and foreclosure rights—active creditor protections, not passive investment. ROA.14436.

*See Marine Bank v. Weaver*, 455 U.S. 551, 558-59 (1982) (privately negotiated, collateralized debt instruments are not securities).

The Ninth Circuit applied *Marine Bank* to facts nearly identical to this case in *McNabb v. SEC*, 298 F.3d 1126 (9th Cir. 2002). In *McNabb*, the SEC alleged that promissory notes secured by real property were securities. The court disagreed, holding that privately negotiated, collateralized loans are not securities when they bear the hallmarks of commercial lending rather than investment. *Id.* at 1130-32. This Court should reach the same conclusion.

The SEC bears the jurisdictional burden yet presented no lender testimony, no Howey analysis, no Reves analysis, and no effort to

distinguish controlling precedent. *See SEC v. Basic Energy*, 273 F.3d 657, 661 (6th Cir. 2001).

**B. Violation of Exclusive Bankruptcy Jurisdiction**

Nine Wall LLC entities were in active Chapter 11 with reorganization plans, DIP status, and U.S. Trustee supervision. ROA.19305. Under 28 U.S.C. § 1334(e)(1), bankruptcy courts have "exclusive jurisdiction" over estate property. *See SEC v. Byers*, 609 F.3d 87, 92 (2d Cir. 2010).

BM318 operated under a *confirmed* Chapter 11 plan binding all parties under 11 U.S.C. § 1141(a). The receiver seized it anyway, settled $55 million in assets for $175,000, and diverted proceeds from plan beneficiaries, whereas the total disputed debt on the property was $35 million. ROA.17318. 2999TC was similarly under bankruptcy protection; the receiver violated the automatic stay, settled a $72.5 million appraised property for $2.5 million, and told bankruptcy creditors to file in separate process. ROA.7490-92.

Orders entered without subject-matter jurisdiction are void *ab initio*. *Steel Co.*, 523 U.S. at 94.

## II. THE RECEIVERSHIP VIOLATES CONSTITUTIONAL PROTECTIONS

### A. The 15:1 Seizure Ratio Is Unconstitutionally Disproportionate

The SEC alleges $26 million in harm. The receiver has seized and largely destroyed over $400 million in assets—a 15:1 ratio. Specific losses include:

| **Property** | **Value** | **Settlement** | **Loss** |
|---|---|---|---|
| BM318 | $55M | $175K | 99.7% |
| 2999 Turtle Creek | $72.5M | $2.5M | 96.6% |
| Wall LLC Portfolio | $100M+ | Fire sales | Massive |

*Grupo Mexicano de Desarrollo v. Alliance Bond Fund*, 527 U.S. 308, 322 (1999), held that federal courts lack equitable power to freeze assets pending judgment. Here, the court authorized *liquidation*—far worse than freezing.

The court's own language reveals punitive intent—describing the need to "punish" Appellant before any finding of liability. ROA.658-682,

ROA.14811-37, and ROA.18979-19006. This violates Fifth Amendment due process, which requires adjudication before deprivation. *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53-54 (1993).

Even post-conviction, a 15:1 forfeiture ratio would violate the Eighth Amendment. *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). Before trial, it surely violates the Fifth Amendment. Under *SEC v. Jarkesy*, 34 F.4th 446 (5th Cir. 2022), the Seventh Amendment guarantees a jury trial before such devastating financial consequences.

Paragraph 85(D) of the Third receivership order ROA.18996 confirms punitive intent: it bars Appellant from creating *any* new business without receiver permission—economic banishment untethered to asset preservation.

**B. Unlawful Seizure of Third-Party Assets**

The receiver seized assets belonging to Appellant's son Max without notice, evidence, tracing, or legal basis—the court found no proper tracing. The receiver sued Appellant's daughter Victoria (a Trump administration employee with security clearances) without involvement, and his ex-spouse before withdrawing for lack of

evidence[6]. The receiver sought Appellant's residence "despite offering no analysis tracing lender funds into that home's purchase." ROA.14410.

The district court rejected the "everything is tainted" theory: the SEC "cannot yet confirm [these entities] received, or otherwise benefitted from, Barton's alleged fraudulent activities." ROA.10496. Yet the receiver continues pursuing untraced assets from family members. This is guilt by association—fundamentally incompatible with due process. *See Scales v. United States*, 367 U.S. 203, 224-25 (1961).

No comparable SEC receivership has authorized the seizure and litigation pattern present here. The receiver sued Appellant's adult children to recover earned wages and legitimate compensation. The receiver sued Appellant's former spouse, then withdrew for lack of evidence only after inflicting reputational and financial harm. The district court imposed a prior restraint barring Appellant's counsel from filing bar grievances—a restriction imposed in no similar proceeding. The receiver sought Appellant's personal residence despite

---

[6] *Cort Thomas, as Receiver for Carnegie Development, LLC, et al. v. Haoqiang Fu (a/k/a Michael Fu), et al., No. 3:24-cv-00612-X (N.D. Tex.)*

offering no tracing analysis connecting it to any alleged fraud. ROA.14410.

This unprecedented treatment of unrelated family members and imposition of speech restrictions—without tracing, without individualized due process, and without precedent in similarly situated receivership cases—constitutes a denial of equal protection and fundamental fairness under the Fifth Amendment. *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (equal protection violated by irrational and unequal treatment).

## III. STRUCTURAL CONFLICTS AND BIAS INFECTED THE PROCEEDINGS

Under *Tumey v. Ohio*, 273 U.S. 510, 532 (1927), and *Ward v. Monroeville*, 409 U.S. 57, 60 (1972), structural conflicts creating a "possible temptation" to bias require disqualification—regardless of subjective fairness. Structural violations require automatic reversal. *Gibson v. Berryhill*, 411 U.S. 564, 578-79 (1973).

### A. The Receiver's Counsel Includes Judge Starr's Former Law Clerks

Brown Fox PLLC, representing the receiver, employs Allan Carrillo and Tim Wells—both former clerks to Judge Brantley Starr. They

appear regularly before their former judge seeking fee approval and expanded powers. Brown Fox has received millions from this receivership; Judge Starr's rulings directly affect their compensation. This is precisely the conflict *Tumey* forbids.

**B. The Court Rejected the SEC's Proposed Receiver**

After two years investigating these real estate assets, the SEC recommended David Wallace—an experienced real estate developer. Judge Starr rejected him and appointed Cortney Thomas—a lawyer with zero real estate experience but partnering Brown Fox having ex-clerks as its employees and Charlene Koonce as the lead counsel who is the alumnus of the same university from where Judge Starr graduated. The SEC's proposed order left the receiver identity blank; it wanted Wallace. ROA.196.

The consequences have been catastrophic. Thomas admitted "little grasp" of how to advance Venus properties that could "double or triple" in value. ROA.14417. BM318 worth $55 million settled for $175,000. 2999TC appraised at $72.5 million sold for $2.5 million. And numerous other examples exist where the employed receiver destroyed value of assets and ensured only self billing throughout till date.

### C. The Statistical Pattern: 100% Denial of Defense Motions

Statistics can reveal bias that individual rulings might conceal. A judge who rules against one party 60% of the time might simply be applying the law to facts that favor the other side. But a judge who rules against one party 100% of the time—on every motion, in every context, without exception—has revealed something about the proceedings that transcends individual rulings.

The record here shows:

- Defense motions granted: 0
- Defense motions denied: ALL
- Receiver requests granted: ALL
- Receiver requests denied: 0

*See United States v. Monsanto*, 491 U.S. 600, 612 n.11 (1989) (statistical improbability can demonstrate bias); *Batson v. Kentucky*, 476 U.S. 79, 93-94 (1986) (pattern of outcomes can establish discriminatory intent).

### D. The Receiver Testified to His Own Reappointment

After this Court's vacatur, the receiver appeared as a *witness* at his reinstatement hearing—testifying about "facts" he gathered to justify

his own continuation in office. This violates the foundational principle that "no man can be a judge in his own cause." *In re Murchison*, 349 U.S. 133, 136 (1955). His overwhelming financial interest ($3M+ in fees till March 2024) rendered this testimony inherently unreliable. ROA.19562-19776.

**E. Netsphere Violation: Unlawful Pecuniary-Purpose Receivership**

*Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012), prohibits receiverships "for the primary benefit of creditors or to administer an insolvent estate for pecuniary purposes." All forbidden characteristics are present: liquidation without plan, claims process, pooled proceeds, priority distributions, and receiver fees from estate assets. ROA.18979-19006.

The financial results confirm pecuniary purpose:

| **Category** | **Amount** |
|---|---|
| Paid to receiver/counsel | ~$3M |
| Distributed to alleged co-lenders | $0 |
| Lenders contacted | 0 |

The receiver has never submitted a liquidation plan, never contacted alleged co-lenders, never verified claims. Unlike the Stanford receiver who waited for most fees, Thomas extracted ~$3 million while victims received nothing.

## IV. PROCEDURAL VIOLATIONS INDEPENDENTLY VOID THE RECEIVERSHIP

### A. Campbell-Kordel Violations

Civil proceedings "must not be allowed to become an instrument for the violation of the constitutional rights of defendants in the criminal case." *Campbell v. Eastland*, 307 F.2d 478, 482 (5th Cir. 1962); *United States v. Kordel*, 397 U.S. 1, 11 (1970).

In November 2022, after DOJ indicted Appellant and requested a stay. ROA 809-19, which was granted by the district court. ROA.1252-53. The court purported to grant it but directed the receiver to prepare reports, conduct tracing, interview witnesses, and compile "any and all information." ROA.305. Nearly all evidence supporting the Third Receivership Order was created during this prohibited period. ROA.14417.

The *Campbell* Court recognized that civil discovery—with its broad disclosure requirements, compelled testimony, and limited privilege

protections—could be weaponized against criminal defendants. A prosecutor who cannot compel a defendant's testimony in a criminal case might use civil proceedings to achieve the same result indirectly. This circumvention violates the Fifth Amendment.

The August 2025 administrative closure effectively admitted the case should have been stayed in 2022. ROA.671. Evidence gathered in violation must be excluded. *See United States v. Stringer*, 535 F.3d 929, 939 (9th Cir. 2008).

Consider the timeline:

- **November 2022:** DOJ indicts Appellant and requests stay
- **November 2022 – March 2024:** Receiver continues operating, gathering evidence, preparing reports
- **March 2024:** Fifth Circuit vacates First Receivership Order
- **March 2024 – June 2025:** Receiver continues operating despite vacatur, creating more evidence
- **June 2025:** District court enters Third Receivership Order based on receiver's evidence
- **August 2025:** The District court issues an administrative stay

The evidentiary foundation for the current receivership was built almost entirely during a period when: (1) DOJ had requested a stay; (2) the original receivership order had been vacated; and (3) the receiver had no lawful authority to act. This is not a technicality—it is a fundamental corruption of the proceedings.

**B. Reliance on Vacated Receiver's Evidence**

This Court vacated the First Receivership Order, rendering it "a legal nullity" with the "slate wiped clean." ROA.14377-78. Vacated orders are "officially gone" with "no legal effect." *Alicea v. Comm'r*, 855 F. App'x 494, 496 (11th Cir. 2021). The receiver's authority "immediately terminated." *Netsphere*, 703 F.3d at 310.

Yet the district court directed the now-unauthorized receiver to continue gathering evidence—then relied on that evidence to reinstate him. This circularity cannot stand. Nunc pro tunc cannot resurrect vacated authority—it is "not [an] Orwellian vehicle for revisionist history." *Roman Catholic Archdiocese v. Acevedo Feliciano*, 140 S. Ct. 696, 701 (2020).

**1. The Fifth Circuit Chose Vacatur Intentionally**

The distinction between vacatur and other appellate remedies matters. This Court had options:

"The Fifth Circuit had a series of remedies before it... It could have decided that the Court's error was one of inadequate explanation, identified the error, and remanded for further consideration. It did not." ROA.14378. This Court could have reversed and remanded—sending the case back for further proceedings while leaving the receivership in place. It could have modified the receivership order, narrowing its scope while preserving the receiver's authority. It could have affirmed in part and reversed in part.

Instead, this Court chose vacatur:

"The Fifth Circuit chose to vacate this Court's order, an appellate remedy that has the intentional and well-established effect of evaporating it and the authority that flows from it as if it never existed." ROA.14378.

Vacatur was not an oversight or a technicality. It was a deliberate remedial choice with deliberate legal consequences. This Court determined that the First Receivership Order was so fundamentally flawed that it should be treated as if it never existed. The district court was bound to honor that determination.

**2. The District Court Directed the Vacated Receiver to Create Evidence**

Instead of honoring the vacatur, the district court directed the now-unauthorized receiver to continue operating. From March 2024 through November 2023, the court ordered the receiver to ROA.14810-37:

- Prepare "interim reports" on the status of assets
- Conduct tracing analyses
- Compile "any and all information" for potential reinstatement
- Continue managing assets (despite having no authority to do so)

This violated the fundamental principle that vacated orders have no legal effect. The receiver's authority derived from the First Receivership Order. When that order was vacated, his authority evaporated. He had no more power to gather evidence or manage assets than any stranger off the street.

Yet the district court treated him as if the vacatur had not occurred. The court continued to direct his activities, accept his

reports, and approve his fee requests. The court used him to build the evidentiary record that would later support his reinstatement.[7]

### 3. Nunc Pro Tunc Cannot Resurrect Vacated Authority

The receiver attempted to cure this defect through nunc pro tunc ratification—asking the court to retroactively validate his unauthorized actions. The Supreme Court has rejected this approach:

"Put colorfully, '[n]unc pro tunc orders are not some Orwellian vehicle for revisionist history—creating "facts" that never occurred in fact.'"

*Roman Catholic Archdiocese of San Juan v. Acevedo Feliciano*, 140 S. Ct. 696, 701 (2020) (quoting *United States v. Gillespie*, 666 F. Supp. 1137, 1139 (N.D. Ill. 1987)).

---

[7] *The circularity is remarkable. The receiver's authority was vacated for lack of evidentiary support. The receiver then created evidence to support his reappointment. The court relied on that evidence to reappoint him. The receiver thus manufactured the justification for his own continuation in office—using authority he did not possess to create evidence that should not exist.*

The *Roman Catholic Archdiocese* Court explained the limited function of nunc pro tunc orders:

"A nunc pro tunc order is only a means for regularizing, as a matter of court record, court orders that were in fact entered in the past but that, due to some clerical oversight, did not find their way onto the docket." ROA.14379.

Nunc pro tunc orders correct clerical errors—situations where a judge actually made a ruling but the ruling was not properly recorded. They cannot create authority that never existed. They cannot validate actions taken without legal basis. They cannot transform void acts into valid ones by retroactive decree.

The receiver's post-vacatur actions were not authorized by any order—clerical error or otherwise. They were unauthorized from the moment of vacatur. No nunc pro tunc order can change that fact.

### 4. All Post-Vacatur Evidence Is Void

The Third Receivership Order rests substantially on evidence the vacated receiver created:

"The comprehensive tracing, urgency narratives, and asset analyses in the Third Order all came from the vacated receiver's work."

This evidence should not exist. It was created by an officer without authority, during a period when he had no power to act, in service of his personal financial interest in reappointment. The court should not have received it. Having received it, the court should not have relied on it.

A receivership cannot rest on void evidence. The Third Receivership Order, to the extent it relies on post-vacatur evidence, must be vacated.

**C. Administrative Closure**

On August 7, 2025, the case was administratively closed. ROA.671. Under *Mire v. Full Spectrum Lending*, 389 F.3d 163, 167 (5th Cir. 2004), administrative closure terminates active proceedings. Yet the receiver continues operating without judicial supervision—liquidating assets, collecting fees, exercising control. A receivership cannot continue in a closed case.

But by then, the damage was done:

a) Over $300 million in assets had been destroyed through fire sales

b) Over $3 million had been paid to the receiver

c) Appellant's ability to defend himself had been crippled by asset deprivation

d) The criminal case had been prejudiced by civil evidence-gathering

e) An entire factual record had been created by an unauthorized receiver

The administrative closure was, in effect, an admission that the case should have been stayed in 2022 when DOJ requested it. The court eventually did what it should have done at the outset—but only after permitting years of constitutional violations.

**D. Privilege Violations**

Appellant has been denied access to his own documents, all injuncted entities records, client-attorney legal work product, Wall LLC records, emails, legal files, tax returns. ROA.14449. and ROA.7448-65. Privilege Protocol. The receiver has accessed and used privileged materials while denying Appellant reciprocal access. Paragraph 46 vests the receiver with authority to waive all privileges—converting an adverse litigation opponent into arbiter of which privileged

communications are disclosed to the government.ROA.18981-84, ROA.19000. This one-sided record creation violates *Brady v. Maryland*, 373 U.S. 83 (1963), and fundamental fairness

**1. Appellant Has Been Denied Access to His Own Documents**

Throughout these proceedings, Appellant has been denied access to his own files:

"The receiver withheld all of Appellant's files during this same period. Appellant did not and does not have access to: Wall LLC records and accounting; BM318 corporate documents; 2999TC files; Email archives; Loan documentation; Trust instruments; Legal attorney-client work product; Tax returns." ROA.14392.

The district court acknowledged this deprivation:

"The vast majority, if not all, of the financial records belonging to Mr. Barton and relating to this matter appear to already have been seized by the Commission or the previously-appointed receiver." ROA.14449.

Appellant cannot defend himself without access to his own records. He cannot challenge tracing analyses without seeing the underlying documents. He cannot dispute financial conclusions without reviewing accounting records. He cannot prepare for trial without his own files.

The receiver controls these documents. The receiver decides what Appellant sees and what he does not. The receiver has used this control to build an evidentiary record that Appellant cannot effectively challenge.

**2. The Privilege Protocol Has Been Systematically Violated**

A privilege protocol ROA.7479-89 was established to protect attorney-client communications and work product. The receiver has systematically violated it. Despite a privilege protocol, the receiver has repeatedly accessed and used privileged materials."

The receiver has cited attorney-client privileged documents in court filings—documents Appellant has not been permitted to see. The receiver has used privileged materials to build his case while denying Appellant access to the same materials for his defense.

This is not mere discovery abuse. It is a structural corruption of the adversary process. The government's agent has obtained and used Appellant's confidential communications while preventing Appellant from reviewing those same communications.

**3. The Receivership Order Purports to Vest Privilege Waiver in the Receiver**

The corruption is structural, not incidental. Paragraph 46 of the receivership orders purports to vest the receiver with authority to "hold" and unilaterally waive all privileges of the receivership entities, including attorney-client privilege. ROA.658-682, ROA.14811-37, and ROA.18979-19006.

This provision converts an adverse, financially interested litigation opponent into the arbiter of which privileged communications will be disclosed to the government. The receiver—who has every incentive to expand his own authority and justify his own fees—decides what confidential legal strategies and communications the SEC will see.

This arrangement offends core Fifth Amendment due process principles. It destroys the "level playing field" between litigants. It gives the government effective control over the defense's confidential communications through its chosen officer.[8]

[8] *The privilege problem is compounded by the parallel criminal proceeding. Materials gathered by the receiver may be shared with DOJ prosecutors. Attorney-client communications seized by the receiver may find their way into the criminal case. The receiver thus serves as a conduit for prosecutorial access to defense materials—precisely what the Fifth and Sixth Amendments forbid.*

**4. The Receivership Orders Compel Production of Defense Materials**

The receivership orders compel Appellant and his companies to turn over "all" books and records—including legal files and work product—to the receiver. ROA.658-682, ROA.14811-37, and ROA.18979-19006.

This compelled production operates while criminal charges are pending and while the SEC and DOJ are actively prosecuting Appellant. In practice:

a) The receiver has gathered and reviewed defense counsel's files

b) The receiver has coordinated with the SEC

c) The receiver has created the evidentiary record the district court relied upon

d) All of this occurred while denying Appellant reciprocal access to his own documents

When the government, acting through a court-appointed officer, gains unfettered access to a defendant's confidential legal strategies and uses that access to build its case, it infringes the Sixth Amendment right to counsel and the Fifth Amendment guarantee of a fair adversarial process.

### 5. One-Sided Record Creation Violates Due Process

The result of these violations is a one-sided evidentiary record: "The record was created entirely by a financially interested, legally unauthorized receiver, while Appellant was denied access to his own documents." ROA.14392. The receiver controlled the documents. The receiver selected which documents to analyse. The receiver prepared the tracing analyses. The receiver created the urgency narratives. The receiver built the factual case for his own reappointment.

Appellant could not respond effectively because Appellant did not have access to his own files. He could not identify errors in the tracing analyses because he could not review the underlying records. He could not present contrary evidence because the contrary evidence was in the receiver's possession.

This violates *Brady v. Maryland*, 373 U.S. 83, 87 (1963), which requires the government to disclose exculpatory evidence. It violates fundamental fairness under *Napue v. Illinois*, 360 U.S. 264, 269 (1959). It violates the basic principle that both sides in an adversary proceeding must have access to relevant evidence.

A proceeding where one side controls all documents and selectively produces evidence is not a fair proceeding. It is a show trial with a predetermined outcome.

## V. THE RECEIVERSHIP LACKS EVIDENTIARY FOUNDATION

### A. The District Court Failed to Rule on Evidentiary Objections

During the receivership hearings, Appellant raised multiple objections to the sufficiency, foundation, and admissibility of the SEC's and receiver's evidence—including tracing analyses, lender identity assertions, asset-ownership characterizations, and settlement-based valuation summaries. ROA.19562-19776.

The district court stated that objections would be ruled on at a later time. They never were.

Yet the court's subsequent orders treated the disputed materials as if admitted and relied upon them extensively. This constitutes reversible error. Failure to rule on timely objections—then using disputed materials as the foundation for dispositive rulings—violates Federal Rule of Evidence 103 and fundamental due process. *See United States v. Polasek*, 162 F.3d 878, 883–84 (5th Cir. 1998) (reversal required

where court's disposition assumes admission of evidence never ruled admissible).

The error is compounded by the district court's own acknowledgment that evidence in this proceeding could only properly come from two sources: the SEC or the Defendant. ROA.19745. The receiver is neither. Yet the court continually relied upon evidence the receiver gathered, created, and presented—evidence developed by an officer who simultaneously served as investigator, fact witness at his own reappointment hearing, and financial beneficiary of the receivership's continuation. The adversarial system forbids any single party from occupying all three roles. *See In re Murchison*, 349 U.S. 133, 136 (1955).

**B. The SEC's Investigation vs. Receiver's Expansion**

The SEC's two-year investigation identified 29 entities. ROA.14389. The receiver expanded to 160+ entities based on "corporate formation binders" and "common addresses"—not tracing. ROA.658-682. The SEC admitted only "spot tracing" at the reinstatement hearing. In the subsequent orders ROA.14811-37 and ROA.18979-19006 , the expansion was ordered for 54 entities under receivership and all other entities under a preliminary injunction ROA.14838-50.

| **Stage** | **Entities** | **Basis** |
|---|---|---|
| SEC Investigation (2 years) | 11 | Subpoenas, document review, witness interviews |
| First Receivership Order | 160+ | "Corporate formation binders," "common addresses" |
| Second Receivership Order | 84 | Undefined "connections" |
| Third Receivership Order | 54 | "Benefitted from" theory |

ROA.658-682, ROA.757-63, ROA 1236-41,ROA 1415-44, ROA 2657-67

**C. The "Staff Accountant" Is Not an Accountant**

Carol Hahn, the SEC's "staff accountant," is not an accountant, not a CPA, holds no forensic credentials, refused to disclose her methodology, and was never qualified under Rule 702. ROA.19675-96. The district court found: "Ms. Hahn—who is not an accountant—is not qualified to reach the accounting conclusions." ROA.14397.

Expert testimony is required for complex tracing. *See United States v. Tao*, 2022 WL 252019, at *12 (D. Kan. 2022). The SEC provided none. The court found: "The Commission and the Receiver failed to identify any methodology underlying their tracing analyses... the Court rejects any conclusions."

**D. The SEC's Accountant Could Not Explain His Work**

Anthony Cecil could not explain Diagram 4 without work papers, did not know what FHC Acquisitions was, could not account for $2.971 million in intervening deposits, and deferred to absent team members who "really did the work." ROA 14407.

This is fatal. Tracing analysis is not simply adding numbers. It requires a methodology—a set of rules for determining which funds are "traced" to which sources when funds are commingled. Different methodologies produce different results.

Consider a simple example. Account A receives $100 from Source X (legitimate) and $100 from Source Y (tainted). Account A then pays $150 to Account B. How much of the $150 is tainted?

a) Under a **FIFO (first-in-first-out)** methodology, it depends on which deposit came first

b) Under a **LIFO (last-in-first-out)** methodology, it depends on which deposit came last

c) Under a **pro rata** methodology, 50% ($75) is tainted

d) Under a **lowest intermediate balance** methodology, the answer depends on account balances at various points

Without knowing the methodology, there is no way to evaluate the conclusions. The same transactions can yield different results depending on which tracing methodology is applied.

**E. Accounting Records Were Ignored**

Transfers documented as intercompany loans in the accounting ledgers were "inexplicably" ignored. ROA.398 at 16; ROA.335. JMJ Development's $17 million in unaffected revenue was never disaggregated. ROA.14401

**F. The "Benefitted From" Standard Has No Legal Basis**

The district court investigated the "benefitted from" language "does not come from the cases Commission cited... originated from the Commission's own briefing." ROA.18980, ROA.14812 and ROA.659-60, ROA.200. This invented standard has no limiting principle and exceeds *Netsphere*'s limits.

*Netsphere* permits a receiver only to preserve specific assets properly within the court's jurisdiction—not to confiscate every business that the SEC claims enjoyed "ambient benefits" from someone else's funds. The "benefitted from" standard exceeds *Netsphere*'s limits and must be rejected.

**G. Property-by-Property Tracing Failures**

The receiver's tracing failures are not abstract. They manifest in specific properties where the receiver claims Wall-funded acquisition without any supporting evidence. The Thomas Declaration ROA.10251-10429 supported by Hahn's schedules ROA.10494-97, asserts that dozens of properties were purchased with Wall lender funds. Property by property, these assertions collapse under examination.

**1. SF Rock Creek, LLC**

The receiver classifies SF Rock Creek as a "receivership entity that holds property purchased with Wall Investor Funds." But the declaration never identifies any transfer from a Wall bank account into the Rock Creek acquisition.

Instead, the receiver relies on generic references to "commingling" and "liquid assets" and vaguely asserts that Rock Creek "benefitted" from

Wall funds. ROA.20222. The project was financed through its own lender arrangements. Any financial distress results from the receiver's mismanagement and the burden of his own fees—not from any misuse of Wall funds.

Without account-level tracing from specific Wall accounts into the Rock Creek purchase, the property cannot lawfully be treated as a Wall-funded asset.

The receiver has compounded the damage through mismanagement. He has rented the property for merely $5,000 per month static for the last 3 years, to a renter who defaulted on several payments—far below market lease rates for comparable properties. ROA19258. He has attempted to liquidate for $1.4 million against comparative nearby properties selling for $2 million or more. *ROA.1*9254.

**2. FHC Acquisition, LLC (Frisco)**

For FHC Acquisition, the receiver again asserts Wall-funded acquisition but offers no tracing from Wall bank accounts into the FHC purchase or development.

Instead, the declaration focuses on "parking challenges," speculative projections about future sale value, and alleged operational issues—

none of which bear on whether Wall lender funds were used to acquire the property. ROA.11666, ROA.14406-07.

FHC was financed through independent sources. The receiver's own failures—delays, poor leasing strategy, unnecessary legal expenses—threaten equity, not any historical infusion of Wall funds. The declaration fails to meet this Court's requirement of actual tracing.

**3. HUD Apartment Portfolio (D4 Entities)**

The receiver attempts to sweep the HUD apartment portfolio—Bellwether Ridge (DeSoto), Parc at Windmill Farms (Forney), Parc at Ingleside (Corpus Christi), and Parc at Opelika (Alabama)—into the receivership by pointing to small, isolated transfers and then characterizing the entire portfolio as "Wall-funded."

The district court already rejected this theory:

"[A]ll funds for construction or initial operations of Bellwether Ridge, Windmill Farms, and Ingleside came from the primary HUD loan or loans provided by Southern Property Capital."

ROA.14430.

The supposed Wall-related transactions were JMJ advances from the development budget not Wall funds ROA.14405-06.

The D4 entities were conventionally financed by HUD and Southern Property Capital. JMJ earned legitimate development fees for its services. Neither Hahn nor Thomas can trace Wall bank accounts into the acquisition or core financing of any of these properties. The receiver has seized multimillion-dollar assets based on de minimis, reversed entries.

**4. Goldmark Hospitality, LLC / Amerigold Suites**

Goldmark/Amerigold exemplifies the substitution of rhetoric for tracing. The receiver asserts that Wall funds "supported" Amerigold Suites but never identifies an initial acquisition funded by Wall lenders.

Amerigold was acquired before the Wall Chinese loans existed. Its capital structure was tied to a separate lender. Any "cash flow issues" were exacerbated by the receiver's choices, not historical fund flows. ROA.10949-50

Pointing to later intercompany movements or temporary advances does not make a property Wall-funded. It cannot justify receivership treatment.

**5. Venus Development / Venus 59, LLC**

The receiver's admissions defeat his tracing theory for Venus. He concedes that Venus 59, LLC itself was not purchased with Wall lender funds, yet urges its inclusion based on generalized claims about "development potential" and future value. The rest were financed through separate lenders and legitimate development arrangements. ROA.10295.

The district court found: "The undisputed evidence in the record is that the Venus properties would be substantially increased in value—by two or three times—if further advanced through government approvals... Yet Mr. Thomas had little grasp on the details of how to do so." ROA.14417.

Rather than proving tracing, the declaration treats the entire Venus platform as fair game because Appellant was involved and because the properties might become valuable. That is not tracing—it is punishment.

### 6. Ridgeview Addition, LLC

Ridgeview Addition is labelled a Wall-funded asset, but the receiver points to no direct transfer from a Wall bank account into the Ridgeview acquisition.

The project followed a typical residential development model with its own financing. References to "commingling" or "benefits" are unsupported by bank records. The receiver's narrative shows ordinary capital-stack structuring, not a Wall-funded purchase.ROA.14404-05.

Without specific tracing, Ridgeview's inclusion violates this Court's mandate in *Barton II*.

**7. 2999TC Acquisitions, LLC**

The declaration treats 2999TC—holding the 2999 Turtle Creek property—as Wall-funded, yet never traces a Wall bank account transaction into the acquisition.

2999 Turtle Creek was a separate, high-value asset with its own financing history and millions in third-party investment from parties unrelated to any Chinese lenders. The later "settlement" of a $72.5 million building for $2.5 million benefited the receiver and his law firm, not investors. ROA.14409-10.

The receiver's references to an "extensive investigation" are unsupported. He identifies no account-level transfers showing Wall funds used to buy this property. Treating 2999TC as Wall-funded is factually wrong and a post-hoc justification for an egregiously undervalued settlement.

Include it that $27.5 million of US tax payer money was liquidated against the Chinese $26 million. And even the proceeds of settlements $2.5 million was received and no creditor was compensated with this except the receiver only.

**8. Mansions Apartment Homes at Marine Creek, LLC**

The receiver never traces a Wall bank account transaction into the Mansions at Marine Creek acquisition.

The development and refinance were funded through separate lender arrangements. JMJ Development earned legitimate development and management fees for its services. Any funds moving between Mansions and JMJ reflect ordinary business compensation, not diversion of Wall investor money. ROA.14410-11.

The effort to classify Mansions as Wall-funded is unsupported.

**9. Orchard Farms Village, LLC**

Orchard Farms Village was formed to address title and structuring issues arising from separate Seagoville litigation—not to divert Wall lender money.

The receiver fails to show a specific transfer from Wall bank accounts into the Orchard Farms purchase. He relies on the fact that other

Appellant-related entities were involved and that Wall007 debt is mentioned as part of a purchaser/developer portfolio. ROA.14404-06.

Mentioning debt in a portfolio description is not tracing. It cannot justify receivership treatment.

**10. Villita Towers, LLC and 126 Villita, LLC**

The district court found:

"Villita Towers is an apartment development in San Antonio, Texas, which began in 2015, two years prior to the first Chinese national loans." ROA.14408.

The Villita entities were capitalized before Wall loans existed. Hahn made "no effort to disaggregate loan proceeds in JMJ's accounts" from JMJ's substantial non-Wall revenue. *Id.*

The receiver offers no complete tracing from any Wall account into the land purchase or core construction financing. Treating Villita as Wall-funded based on later commingled flows—without disaggregation—is precisely what this Court has forbidden.

**11. BM318, LLC — Bear Creek**

The flaws in BM318 are particularly stark. Hahn's own schedules show the Bear Creek ranch was purchased for roughly $35 million,

financed primarily by a loan from the Dixon Water Foundation, with approximately $2.1 million in cash at closing. ROA.10494-97.

BM318 made required payments to Dixon, later sold acreage to Lumar Land & Cattle, and satisfied its obligations—generating profit. The result: a property worth $55 million under a confirmed bankruptcy plan settled for $175,000—a 99.7% loss.

**12. Seagoville Farms, LLC**

The receiver conflates unrelated projects to sweep in Seagoville Farms. The property began with its own land purchase and financing. Later proceeds were used for legitimate business purposes unrelated to Chinese Wall lenders.

The declaration does not trace any specific Wall deposits into the Seagoville acquisition. ROA.10940-41.

**13. Gillespie Villas, LLC**

Gillespie Villas—one of the original 11 defendant entities—is listed as Wall-funded, yet financial records show no tracing from Wall bank accounts into the purchase.

The declaration relies on an appraisal and later repair costs. Appraised value says nothing about source of acquisition funds.

ROA.10940-43. The lack of tracing, plus the receiver's acknowledgment that the property's history predates the Wall loans, means Gillespie cannot be treated as a Wall-funded asset.

**14. TC Hall, LLC**

TC Hall is another entity where the receiver fails to produce account-level tracing from Wall entities into the purchase.

Large payments associated with TC Hall came from non-Wall sources. The receiver's discussion of alleged "$1.4 million" movements is unsupported by bank statements. He relies on "benefit" language rather than proof. ROA.10943-45.

**G. Entities Without Bank Accounts Were Included**

The absence of rigorous tracing is confirmed by an embarrassing fact: multiple entities in the receivership have never had bank accounts:

"Multiple entities in the receivership have never had bank accounts."

An entity without a bank account cannot receive wire transfers. It cannot receive checks. It cannot receive or transmit funds through the financial system. It is, for tracing purposes, a legal fiction—a name on paper with no financial substance.

How can such an entity be included in a receivership premised on receipt of fraudulent funds? It cannot have received fraudulent funds because it has no mechanism to receive any funds.

The inclusion of bank-less entities proves the receiver's methodology is not tracing at all. It is guilt by association—if an entity is associated with Appellant, it belongs in the receivership regardless of whether it received anything.

### H. The Receivership Has Caused More Harm Than the Alleged Fraud

Step back and consider the full picture.

The SEC alleges a $26 million fraud. Assume, for argument's sake, that every allegation is true. The maximum harm would be $26 million—the total amount allegedly diverted from lenders.

The receivership has destroyed over $300 million in value. It has cost more than ten times the alleged fraud.

| **Source** | **Amount** |
|---|---|
| Alleged fraud | $26 million |
| Receivership destruction | $400+ million |
| **Ratio** | **15:1** |

The cure has been worse than the disease—by an order of magnitude and Chinese non-tax paying CCP connected lenders have prioritized over US Tax paying actual citizens. Just like the COVID 19, the Chinese came in, they destroyed the value and the American had to pay the price. All enforced by the SEC and its void receiver.

Even if Appellant is guilty of everything alleged, the receivership has been a catastrophe. It has destroyed far more value than could possibly be recovered for victims. It has enriched the receiver while impoverishing everyone else. It has converted a disputed $26 million claim into $400 million in actual, undisputed losses.

"The receivership has caused more economic harm than the alleged fraud itself."

This is not equity. This is not justice. This is destruction for destruction's sake—with the receiver collecting fees on every transaction.[9]

## VI. THE RECEIVER BREACHED ALL FIDUCIARY DUTIES

A receiver owes duties of preservation, care, loyalty, and value maximization. *SEC v. Hardy*, 803 F.2d 1034, 1038 (9th Cir. 1986); *Liberte Capital Grp. v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006).

### A. Scale of Destruction

| **Category** | **Amount** |
| --- | --- |
| Assets seized | $400M+ |
| Value destroyed | $300M+ |
| Paid to receiver | ~$3M |
| Distributed to victims | $0 |

[9] *The mathematics are irrefutable. If the alleged fraud was $26 million, and the receivership has destroyed $300 million, then the receivership has made victims worse off by $274 million. Had no receiver been appointed—had the assets simply sat untouched—the alleged victims would have recovery prospects orders of magnitude better than they have now. The receiver's "protection" has been the most damaging force in this entire case.*

The receivership destroyed more than 10x the alleged fraud. ROA.398 at 8 ("The receivership has caused more economic harm than the alleged fraud itself.").

**B. Property-by-Property Destruction**

| **Property** | **Value** | **Settlement** | **Loss** |
|---|---|---|---|
| BM318 | $55M | $175K | 99.7% |
| 2999 Turtle Creek | $72.5M | $2.5M | 96.6% |
| DLP Properties | $32M+ | $750K | 97.6% |
| Illinois Property | $1M+ | $75K | 92.5% |

These were not distressed sales forced by market conditions. The receiver conducted no marketing, solicited no competitive bids, engaged no brokers. He simply accepted lowball offers and collected fees.

**C. Pattern of Artificial Emergencies**

The receiver claims "emergency" to justify rushed sales, but "the only emergency is his own fee invoices." The case was stayed, vacated, or closed throughout—no genuine urgency existed.

| Property | Settlement Amount / Sale | Owed / Debt | Prospect |
|---|---|---|---|
| Illinois Property ROA 17481-85 | $75,000 settlement | $400,000 owed | Closing in a week from now for over $1 million |
| BM318 ROA 17486-91 | $175,000 settlement | $28.5 Million Debt | Being sold for $55 million |
| 2999 TC ROA 7490-92 | $2.5 Million Settlement | $38.5 Million Debt | $72.5 Million Appraised Value |
| DLP Properties (4 assets) ROA 19369-407 | $750,000 Settlement | Selling shares rights | 1 of 4 assets being sold this week for over $32mm |

**D. No Plan, No Victim Contact**

The receiver never submitted a liquidation plan showing what would be sold, expected values, or distribution proposals. ROA.19003. In three years, he has never contacted a single alleged victim, never verified a claim, never made a distribution.

A fiduciary who breaches duties is liable for resulting harm. Thomas should disgorge his $3 million in fees and be held liable for $300+ million in destroyed value.

While there has been no contact established with the alleged Chinese Co-lenders, the receiver did reach out to Michael Fu, a convicted fellow in the same DOJ case, to act as the mediator or translator for him to interact with the Chinese. This is a serious violation and creates the idea of receiver for pure punishment of the Appellant through all the available tools and the broadest reach that the district court has granted to him.

## VII. FIRST AMENDMENT VIOLATION AND WHISTLEBLOWER RETALIATION

### A. Prior Restraint on Bar Grievances

On June 23, 2025, the district court ordered that Appellant must obtain judicial pre-approval before filing any bar grievance against the receiver or his counsel. ROA.18979-19006 . This is prior restraint in its purest form.

Remarkably, the court found "no bad faith on the part of the Receiver and his counsel." ROA.18977-78. If no bad faith exists, grievances will be dismissed on their merits—but the bar disciplinary system, not the

court, should make that determination. The order also requires the estate to fund the receiver's defense—a financial penalty for exercising constitutional rights.

Prior restraints bear "a heavy presumption against constitutional validity." *Near v. Minnesota*, 283 U.S. 697, 713-14 (1931). The right to petition includes filing complaints with government agencies. *BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 524-25 (2002). An order requiring judicial pre-approval is a blanket prohibition failing strict scrutiny—no compelling interest, not narrowly tailored, and less restrictive alternatives exist (the bar disciplinary system already handles frivolous complaints).

**B. Whistleblower Retaliation**

Federal law protects whistleblowers. 18 U.S.C. § 1513(e). Retaliatory prosecution violates due process. *Hartman v. Moore*, 547 U.S. 250, 259-60 (2006).

In 2019, Appellant discovered Michael Fu's money laundering: 65% of funds came from parties other than named lenders; Fu demanded repayments to U.S. accounts, not China; Fu's advisor had CCP connections himself too. ROA.11576; ROA.14427. Appellant reported to the FBI, DHS, Treasury, and DOJ. ROA.14427.

The agencies declined, calling it a "Chinese nationals problem."

After the January 2021 administration change:

- DOJ indicted Appellant for the transactions he reported
- Fu received immunity and became the government's witness
- The FBI conducted a theatrical 5:00 a.m. raid
- The government falsely claimed Appellant was a pilot who might flee

The sequence establishes retaliation: protected activity (2019 report) → refusal to investigate → administration change → prosecution of reporter → immunity for reported person.

Every alleged victim is a Chinese national. Not one has appeared, testified, or filed a claim. ROA.14412. The government is acting as a collection agency for foreign nationals who may themselves be criminals—prosecuting an American whistleblower to benefit Chinese money launderers.

# CONCLUSION

This case represents a profound failure of the federal judicial system to protect constitutional rights. The SEC has asserted jurisdiction over transactions that are not securities—commercial loans designed for Chinese capital flight, not investment. The district court has seized property under the exclusive jurisdiction of bankruptcy courts. It has authorized the destruction of over $300 million in value to address alleged harm of $26 million. It has permitted a receiver with zero real estate experience—appointed over the SEC's own recommendation—to conduct fire sales yielding 1-3% of asset values while extracting $3 million in fees and distributing nothing to alleged victims.

The proceedings have been infected with structural conflicts: the receiver's counsel includes the presiding judge's former law clerks; the court has denied 100% of defense motions while granting 100% of receiver requests; the receiver testified as a witness to justify his own reappointment. The procedural violations are independently fatal: evidence was gathered during a DOJ-requested stay; the court relied on evidence created by a receiver whose authority had been vacated; the case has been administratively closed yet the receiver continues operating without supervision.

The receiver has systematically isolated Appellant from professional representation by filing suit against six attorneys, employees, advisors, and consultants associated with Appellant's defense—then immediately staying those proceedings to impose litigation burdens while denying any opportunity to defend on the merits. The receiver has further pursued contempt motions and other adversarial actions against defense counsel. The cumulative effect is that no attorney will accept representation given the certainty of receiver-initiated retaliation. Appellant proceeds pro se not by choice but by necessity—a deprivation of meaningful representation that violates due process. The evidentiary foundation is non-existent. The SEC's "staff accountant" is not an accountant. No tracing methodology was ever disclosed. The receiver's accountant could not explain his own diagrams. Accounting records documenting transfers as legitimate intercompany loans were ignored. Multiple receivership entities have never had bank accounts and could not have received any funds. The "benefitted from" standard justifying the receivership's reach was invented by the SEC—no court has ever endorsed it.

The receiver has breached every fiduciary duty. Properties worth tens of millions have been sold for pennies on the dollar. No liquidation plan

was ever submitted. No alleged victim has ever been contacted. The receivership has caused more economic harm than the alleged fraud itself.

And underlying it all is something darker: an American citizen who reported Chinese money laundering to federal authorities has been prosecuted while the money launderer received immunity. Every alleged victim is a Chinese national who refuses to appear. The government is functioning as a collection agency for foreign nationals who may themselves be criminals. The district court has imposed a prior restraint on Appellant's First Amendment right to file bar grievances—requiring judicial pre-approval before he can seek professional accountability for the receiver's conduct.

For the foregoing reasons, Appellant respectfully requests that this Court:

**Primary Relief**

1. Vacate the Third Receivership Order in its entirety as void ab initio for lack of subject-matter jurisdiction, and declare all orders entered pursuant to the receivership void and of no legal effect;

2. Terminate the receivership immediately and permanently, and order the complete unwinding of all receivership actions, sales, settlements, and transfers;

3. Direct restoration of all seized property to their rightful owners and require disgorgement of all fees, proceeds, and compensation wrongfully obtained by the receiver and his counsel;

4. Remand with instructions to dismiss the SEC's complaint for lack of subject-matter jurisdiction.

**Alternative Relief**

5. Vacate all orders of the district court and remand with instructions for reassignment to a different district judge due to demonstrated bias and structural conflicts of interest, with proceedings transferred to a Special Master or United States Magistrate Judge for de novo consideration;

6. Remand for jury trial on all factual issues pursuant to *SEC v. Jarkesy*, 34 F.4th 446 (5th Cir. 2022).

**Further Alternative Relief**

7. Vacate the Third Receivership Order and remand for further proceedings consistent with this Court's opinion;

8. Stay all receivership activity pending resolution of the parallel criminal proceeding.

**General Relief**

9. Award Appellant costs of this appeal;

10. Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

*/s/Timothy L. Barton*
**Timothy L. Barton**
*Pro Se Appellant*
1846 E Rosemeade Pkwy,
#232 Carrollton, TX 75007
Tel: (214) 673-8714
Timothy.Barton@proton.me

Date: December 10, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/Timothy L. Barton*
Timothy L. Barton

---

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 12,374 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/Timothy L. Barton*
Timothy L. Barton

Dated: December 10, 2025